Kenneth P. UHL, Plaintiff,

v.

Dennis P. SWANSTROM, individually and in his official capacity as 185th TFG Commander, Iowa Ang, Warren G. Lawson, individually and as Adjutant General, Iowa Air National Guard, the Iowa Air National Guard, the United States and the Department of the Air Force, Defendants.

No. C 91–4012.

United States District Court,
N.D. Iowa,
Western Division.

Feb. 21, 1995.

Blake Parker of Parker & Fors, Fort Dodge, IA, for Kenneth P. Uhl.

Grant Dugdale, Asst. Atty. Gen., for Iowa Air Nat. Guard, Col. Dennis P. Swanstrom, and Adjutant General Warren G. Lawson.

**ORDER REGARDING PLAINTIFF'S MO-TION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDG-MENT**

BENNETT, District Judge.

I. PROCEDURAL BACKGROUND ........................................ 1548
II. STANDARDS FOR SUMMARY JUDGMENT ............................ 1551
III. FINDINGS OF FACT ................................................. 1553
IV. LEGAL ANALYSIS ................................................... 1554
 A. The Statute Of Limitations For § 1983 Claims ......................... 1555
 1. The Applicable Statute .......................................... 1555
 2. Accrual Of A § 1983 Claim ....................................... 1556
 3. Tolling Of The Statute Of Limitations ............................ 1556
 B. The Statute Of Limitations For Privacy Act Claims ...................... 1560
 C. The Feres Doctrine .................................................. 1561
 1. Rationale For The Doctrine ....................................... 1561
 2. The Test For Applicability Of The Doctrine ........................ 1563
 3. Claims To Which Feres Applies .................................... 1565
 a. Claims By Service Personnel And Dependents ................... 1565
 b. Claims By National Guard Members ............................ 1565
 5. Application Of Feres In This Case ................................. 1567
V. CONCLUSION ....................................................... 1570

This case is a stark and troublesome reminder that the law does not always provide a remedy for every wrong. A former civilian technician and lieutenant colonel in the Iowa Air National Guard filed this lawsuit asserting violations of his rights to equal protection and due process, pursuant to 42 U.S.C. § 1983, along with a claim for violation of the Privacy Act of 1974, 5 U.S.C. § 552 *et seq.* and a pendant state law claim pursuant to the Federal Tort Claims Act, arising from his discharge from his military position and resultant loss of his civilian position. The plaintiff has now moved for partial summary

judgment on his claims of violation of his constitutional rights on the ground that the administrative processes of the armed forces have already concluded that his rights were violated in the course of his discharge. Defendants, plaintiff's superior officers and the Iowa Air National Guard itself, have moved for summary judgment as to all claims on the ground that such claims are barred by the *Feres* doctrine, which limits tort claims by military personnel against their superior officers for injuries incident to their military service. Defendants also assert that plaintiff's claims are time-barred by the applicable statute of limitations. For the reasons articulated in this opinion, the court is constrained to apply the *Feres* doctrine in the circumstances of this case, and to grant defendants' motion for summary judgment. The court finds that this result dictated by the *Feres* doctrine and controlling authority is harsh—depriving the plaintiff of a meaningful remedy even if he can establish constitutional and legal violations by his former superiors. This case demonstrates that "[h]ow one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought." *Letelier v. Republic of Chile*, 748 F.2d 790, 791 (2d Cir. 1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

## I. PROCEDURAL BACKGROUND

Plaintiff Kenneth P. Uhl filed this lawsuit on January 22, 1991. An amended complaint was filed on February 21, 1991. The amended complaint contains claims of violation of Uhl's constitutional rights to due process and equal protection brought pursuant to 42 U.S.C. § 1983, intentional interference with a contract, and violation of provisions of the Privacy Act of 1974, 5 U.S.C. § 552a(g)(1). Defendants originally included Uhl's commanding officer, Col. Dennis P. Swanstrom, the commander of the 185 Tactical Fighter Group of the Iowa Air National Guard stationed at Sergeant Bluff, Iowa, Warren G. Lawson, the Adjutant General of the Iowa National Guard, the Iowa Air National Guard (IANG), the United States of America and the Department of the Air Force.

On June 9, 1988, plaintiff Kenneth P. Uhl was honorably discharged from the IANG following a decision of the Medical Examination Board (MEB) finding him mentally unfit for world-wide service. Uhl initially pursued his claims arising from his discharge through administrative processes of the military. The Department of Defense Inspector General's (DoD/IG's) investigation concluded, in a final report issued January 24, 1989, that the MEB procedure in this case had been badly flawed and was furthermore wholly inappropriate. The DoD/IG recommended Uhl's reinstatement. Consequently, on June 21, 1990, the Air Force Board to Correct Military Records (AFBCMR) expunged the medical reasons for Uhl's discharge from his permanent record, which leaves Uhl fully qualified for continued military service.

On April 20, 1990, Uhl filed an administrative claim with the Department of the Army and Air Force National Guard Bureau under the Federal Tort Claim Act (FTCA), 28 U.S.C. §§ 2671–2680. This claim alleged wrongful discharge on the ground of violation of the constitutional right to equal protection, intentional interference with contract, and violation of the Privacy Act of 1974, 5 U.S.C. § 552a, *et seq.* The Department of the Air Force denied Uhl's FTCA claims on August 31, 1990.

The IANG refused to reinstate Uhl even in the face of the recommendation of the DoD/IG and the action of the AFBCMR. Uhl therefore filed suit, first in Iowa district court for Woodbury County, then in this federal district court. The petition filed in state court on May 25, 1990, against Swanstrom and the IANG, alleged defamation, state action "under color of state law, in discharging the Plaintiff and depriving him of rights protected by State and Federal Laws and federal rules and regulations," and sought monetary damages and injunctive relief reinstating him to his military and civilian positions with the IANG. Petition, Uhl v. Swanstrom, No. 100726C, Iowa District Court for Woodbury County, (State Petition) ¶¶ 4, 18, 19, Defendants' Exhibit C in Support Of Defendants' Motion For Summary Judgment. On November 26, 1990, the Iowa district court granted the IANG's motion to

dismiss pursuant to the *Feres* doctrine,[1] but denied Swanstrom's motion to dismiss on the same ground. Swanstrom's subsequent motion for summary judgment on the basis of the *Feres* doctrine was granted on September 24, 1991.

In the interim between filing and dismissal of his state court petition, Uhl filed this federal lawsuit on January 22, 1991. An amended complaint in this action was filed on February 21, 1991. The amended complaint is in four counts. Count I, brought pursuant to 42 U.S.C. § 1983, alleges that by failing to follow the procedures mandated by Air Force, DoD, and ANG regulations and directives, defendants deprived Uhl of his property interest in his civil service position without the due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. This count seeks actual, incidental, and punitive damages, as well as interest, attorney fees, and costs.

Count II alleges wrongful discharge and also appears to be a cause of action brought pursuant to 42 U.S.C. § 1983. The wrongful discharge claim alleges that the wrongfulness of the discharge was denial of the right of equal protection in violation of the Fifth and Fourteenth Amendments.[2] The claim in Count II was a claim filed under the FTCA in the appropriate administrative process described above, and denied in that process on August 31, 1990. Count II seeks actual, incidental, and punitive damages, as well as interest, attorneys fees, and costs.

Count III alleges violation of the Privacy Act of 1974, 5 U.S.C. § 552a, *et seq.* This count alleges that defendants failed to maintain accurate information in Uhl's military record, and in fact inserted inaccurate information without corroboration and without informing Uhl. In addition, it alleges dissemination of that information to medical professionals and to the press with the express

purpose of injuring Uhl's reputation. The claim in Count III was also a claim filed under the FTCA in the appropriate administrative process described above, and denied in that process on August 31, 1990. Count III seeks actual, incidental, and punitive damages, as well as interest, attorneys fees, and costs.

Finally, Count IV alleges intentional interference with contract. It alleges that defendants intentionally, improperly, and maliciously altered Uhl's employment records in an attempt to interfere with Uhl's employment with the IANG. The claim in Count IV was also a claim filed under the FTCA in the appropriate administrative process described above, and denied in that process on August 31, 1990. The relief sought in this count, as in the other counts, includes actual, incidental, and punitive damages, interest, attorneys fees, and costs. In addition, as general relief, the amended complaint seeks (1) declaration that the acts of the defendants violated Uhl's rights to due process and equal protection, the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*, and provisions of the National Guard Technicians Act, 32 U.S.C. § 704 *et seq.*; (2) reinstatement of Uhl to active employment and military status with the IANG; (3) recompense for or reinstatement of lost wages, benefits, seniority, and all other benefits of Uhl's employment; (4) "actual and compensatory damages ... including punitive damages"; and (5) such other relief as the court deems proper, including attorneys fees and costs.

On March 26, 1991, defendants Swanstrom, Lawson, and the IANG moved to dismiss the complaint, as did the United States on April 25, 1991. These motions to dismiss were premised primarily on the ground that the *Feres* doctrine barred such claims against the defendants, but also included challenges based on the statute of limitations, the Eleventh Amendment, res judicata and collateral

1. The *Feres* doctrine is discussed in substantial detail *infra*.

2. The Amended Complaint's "Second Cause of Action: Wrongful Discharge" states, in pertinent part, that "Defendants acted [in pursuing a course of conduct which was intentionally developed to deprive the claimant of his civil service

job] in an unreasonable, arbitrary and capricious manner, and have thereby deprived Plaintiff of equal protection of the laws guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. ‾[sic] 1983." Amended Complaint, ¶ 34 (interpolating the allegation of conduct from ¶ 30).

estoppel, and failure of the Privacy Act to provide for claims against a state agency (the IANG). The court, Hon. Donald E. O'Brien, now Senior Judge, treated the motions to dismiss as motions for summary judgment on the ground that various exhibits had been submitted by both parties in support of their respective positions on the motions.

 Initially, the court denied the motions to dismiss on April 7, 1992, but certified interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The appeal was dismissed, in a judgment handed down April 27, 1993, for want of subject matter jurisdiction, because the appeal was not timely filed. However, on May 26, 1993, in a ruling on a motion to reconsider, Judge O'Brien dismissed the United States and the United States Air Force from this lawsuit, with the condition that "[i]f it becomes apparent at some future point that these defendants are required in order to grant plaintiff relief he seeks, they will be brought back in to this case as defendants." The May 26, 1993, order reaffirmed denial of the motion to dismiss by Swanstrom, Lawson, and the IANG. The May 26, 1993, order also specifically stated that "[t]he defendants are not precluded from raising issues [herein] on a motion for summary judgment."[3]

The present motions by the parties are such motions for summary judgment. On November 11, 1994, Uhl moved for partial summary judgment as to Count I asserting that there is no genuine issue of material fact that Uhl's civil rights to due process, and apparently also Uhl's rights to equal protection, have been violated.[4] In this motion,

---

**3.** Uhl has argued, *inter alia*, that these rulings are the law of the case, and that this court may not now revisit the issues of the statute of limitations or the effect of the *Feres* doctrine upon Uhl's claims. The doctrine of "law of the case" provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1210 (8th Cir.1995); *Morris v. American Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir.1993) (quoting *Arizona v. California*). The doctrine prevents relitigation of settled issues in an action, thus protecting the expectations of the parties, ensuring uniformity of decisions, and promoting judicial efficiency. *UniGroup, Inc.*, 45 F.3d at 1211, (quoting *Morris* and *Little Earth of the United Tribes, Inc. v. United States Dep't of Housing & Urban Dev.*, 807 F.2d 1433, 1440–41 (8th Cir. 1986)); *Morris*, 988 F.2d at 51. However, the doctrine is one of discretion. *Arizona v. California*, 460 U.S. at 618, 103 S.Ct. at 1391; *UniGroup, Inc.*, 45 F.3d at 1210; *United States v. Callaway*, 972 F.2d 904, 906 (8th Cir.1992); *Harbor Ins. Co. v. Essman*, 918 F.2d 734, 738 (8th Cir.1990); *Little Earth*, 807 F.2d at 1441. The court's prior decision is usually followed "unless ... the prior decision is clearly erroneous and works a manifest injustice," *Callaway*, 972 F.2d at 905; *Harbor Ins. Co.*, 918 F.2d at 738; *Little Earth*, 807 F.2d at 1433, or if the facts have changed since the earlier decision. *Little Rock Sch. Dist. v. Pulaski*, 971 F.2d 160, 165 (8th Cir.1992); *Little Earth*, 807 F.2d at 1433. The doctrine only applies to issues decided on final judgments. *Peterson v. General Motors Corp.*, 975 F.2d 518, 522 (8th Cir.1992) (citing *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 286 n. 16 (8th Cir.1986)). The doctrine does not apply "when an intervening decision from a superior tribunal clearly demonstrates the law of the case is wrong." *Morris*, 988 F.2d at 52 (citing *Dean v. Trans World Airlines, Inc.*, 924 F.2d 805, 810 (9th Cir.1991); *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 241 n. 7 (6th Cir.1990); *Barrington Press, Inc. v. Morey*, 816 F.2d 341, 342 n. 2 (7th Cir.), *cert. denied*, 484 U.S. 906, 108 S.Ct. 249, 98 L.Ed.2d 207 (1987); *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1089 (D.C.Cir. 1984) (*per curiam*), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985)).

The previous ruling, denying the motion to dismiss on the basis of the *Feres* doctrine was not a final judgment. Furthermore, the decision of the Eighth Circuit Court of Appeals in *Wood v. United States*, 968 F.2d 738 (8th Cir.1992), which this court finds determinative of issues in this case, was handed down after Judge O'Brien's prior ruling on the applicability of the *Feres* doctrine. Finally, the court finds that, if for no other reason, Judge O'Brien specifically left the door open for the present motions on the present grounds. Therefore, the court will revisit the issues previously addressed in the motions to dismiss so far as they are raised here.

**4.** Uhl's "First Cause of Action" alleges violation of Uhl's due process rights, while only the "Second Cause of Action" alleges violation of his rights to equal protection. However, Uhl's motion for partial summary judgment is couched in the following terms:

This Motion for Partial Summary Judgment asserts that there are no contested facts regarding the first cause of action: violation of the plaintiff's civil rights. As a result of those violations, the plaintiff requests that the court declare that the acts of the Defendants violated the plaintiff's due process and equal protection rights granted by the Fifth and Fourteenth

Uhl asserts that there is no question of material fact concerning violation of his rights by the convening and conduct of the Medical Examination Board with the purpose of discharging him, because the administrative processes of the military have already declared this to be so. Defendants resisted the motion for partial summary judgment on December 15, 1994, but assert that their response to this motion for partial summary judgment is encompassed in their own motion for summary judgment.

Defendants moved for summary judgment as to all of Uhl's claims on December 14, 1994. Defendants assert several grounds for summary judgment. Defendants contend, first, that Uhl's amended complaint presents nonjusticiable claims under the *Feres* doctrine. Next, defendants contend that Uhl's claims are barred by the statute of limitations. Third, defendants argue that Uhl's claims should be barred by the doctrine of issue preclusion as the result of the rulings of the Iowa district court dismissing Uhl's lawsuit in state court. Defendants also argue that the IANG and the individual defendants sued in their official capacities are not "persons" subject to liability under 42 U.S.C. § 1983. Further, they contend that Uhl has failed to allege a constitutionally protected property interest in his positions with the military and as a civilian in the IANG. Finally, defendants assert that they are entitled to qualified immunity. Defendants filed certain supplemental documents in support of their motion for summary judgment on December 27, 1994. Uhl resisted the motion for summary judgment on January 17, 1995.

Oral arguments were held on the motions for summary judgment on January 30, 1995. Plaintiff appeared in person and was represented by counsel Blake Parker of Parker & Fors, in Fort Dodge, Iowa. Defendants appeared telephonically through counsel Grant Dugdale, Assistant Attorney General. The motions have been ably argued by counsel for both sides, both in their written and oral submissions. This matter is now fully submitted. Having completed its survey of the

Amendments to the United States Constitution, 42 U.S.C. § 1983, and various military rules and regulations. Plaintiff also requests that the court direct the Defendants to reinstate

rather involved procedural history of this case, the court turns to the standards applicable to resolution of the parties' motions for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ...

Plaintiff to active civil service employment and military status and all the privileges thereto. Plaintiff's Motion For Partial Summary Judgment, ¶ 1.

may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a), (b), & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[5] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, and give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The moving party is not required by *Rule 56* to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. The nonmoving party is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed. R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir. 1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factu-

---

**5.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel,* 953 F.2d at 394.

ally unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment);

*Johnson*, 931 F.2d at 1244. However, this standard of reluctance to grant summary judgment in employment cases does not come into play here, because the court finds that this matter must be disposed of on procedural grounds, without reaching the merits of Uhl's claims arising from his discharge. With the standards discussed above in mind, therefore, the court turns to consideration of the parties' motions for summary judgment.

## III. FINDINGS OF FACT

Neither party asserts that a genuine issue of material fact will deprive the other party of summary judgment at this point in the proceedings. Rather, the parties' motions for summary judgment are based entirely on issues of law. Therefore, the court, although proceeding with due care not to misrepresent the record, will confine itself to a statement of facts it believes the parties would consider undisputed.

Uhl was a dual-status employee of the Iowa Air National Guard, as provided in the National Guard Technicians Act of 1968, 32 U.S.C. § 709: He was a Lt. Col. in the IANG, and a civilian technician. In his military capacity, he was the Commander of the Civil Engineering "Prime Beef" Squadron, 185th Tactical Fighter Group, stationed at the IANG based located at Sergeant Bluff, Iowa. In his civilian capacity, Uhl was the base engineer for the 185th Tactical Squadron. His civilian technician position required that he also hold his military position; thus when he was discharged from the IANG, he also lost his civilian position. 32 U.S.C. § 709(e)(1). Uhl asserts, and the defendants do not dispute, that Uhl's military and civilian performance evaluations were consistently above average. Uhl asserts, however, that he began to encounter difficulties with his superior officer, Col. Swanstrom, because he objected to the allocation of certain funds he believed were designated for other base construction projects to redecoration of base office facilities. Defendants assert that their problems with Uhl's performance stemmed from three alleged incidents of sexual harassment by Uhl.

Whatever the actual cause of the friction between Uhl and his commanding officer, on April 9, 1988, Swanstrom informed Uhl that he would be subjected to an examination by a Medical Evaluation Board (MEB), which was being convened for April 10, 1988. Uhl was given no other notice of the MEB proceedings, nor any notice of the reason for it or copies of any documents the MEB would consider. The MEB examination had been requested by Swanstrom on the basis of the allegations of the three incidents of sexual harassment by Uhl. On May 15, 1988, the MEB reported that Uhl's qualifications for world-wide service were questionable. On May 31, 1988, the Department of the Air Force determined that Uhl was medically disqualified for continued ANG service on the basis of the MEB report. As a consequence, on June 9, 1988, Uhl was honorably discharged from the IANG on the grounds of a medical disqualification. Following his discharge from his military position, Uhl was also discharged from his civilian employment for want of the proper military status pursuant to 32 U.S.C. § 709(e)(1). Uhl's efforts to seek administrative and judicial relief followed.

## IV. LEGAL ANALYSIS·

In order to effect proper resolution of this matter under the applicable law, it is important to understand what Uhl's claims actually pleaded are, as opposed to what they have at times been characterized to be. There has been some confusion as to whether or not Uhl's principal claim is an allegation of refusal to reinstate him in violation of rights of equal protection and due process despite the decisions of the military boards that procedures used to discharge Uhl were at "such variance from regulation as to render the decision invalid,"[6] and its recommendation that reinstatement should be ordered.[7] If such a claim were in fact pleaded, there might be a colorable argument based on the law of this and other circuits that Uhl's lawsuit escapes the bar of the *Feres* doctrine, because it would change the nature of the claim. Furthermore, if such a claim had in fact been pleaded, there would be a colorable argument that such a claim escapes the bar of the applicable statute of limitation, because it would change the date upon which Uhl's claim accrued.

However, that is not the claim pleaded in the Amended Complaint. Rather, the first cause of action pursuant to 42 U.S.C. § 1983 in the Amended Complaint alleges that the denial of rights occurred when Uhl was *discharged* in a process that did not comply with military regulations, thus violating due process guarantees of the Fifth and Fourteenth Amendments. That discharge occurred on June 9, 1988. The remedy sought is actual, incidental, and punitive damages—not reinstatement. No other claim in the Amended Complaint specifically seeks reinstatement as a remedy, nor can any of the claims be reasonably construed to allege wrongful refusal to reinstate Uhl. The second cause of action alleges violation of equal protection rights *in Uhl's discharge;* the third alleges violation of the Privacy Act for failing to maintain accurate information in Uhl's military records; and the fourth cause of action alleges intentional interference with contract, again on the basis that the alteration of Uhl's employment records was in violation of the Privacy Act, and breached an implied covenant of good faith and fair dealing guaranteed by DoD rules and regulations, the National Guard Technicians Act, 32 U.S.C. 709, *et seq.,* and Iowa Code Ch. 29A.

The relief prayed at the conclusion of the complaint, which presumably applies to all of the counts, includes declaratory judgment to the effect that Uhl's due process and equal protections rights and rights under the Privacy Act and National Guard Technicians Act have been violated, *reinstatement,* and monetary damages. Although the Amended Complaint seeks reinstatement generally as a form of relief, *it does not, at least according*

---

6. This statement appears in the DoD/IG's "Report of Investigation," Plaintiff's Exhibit 9 in Support Of Motion For Partial Summary Judgment at C41.

7. Most recently, at the oral arguments on these motions, Uhl's counsel characterized his claim as a continuing constitutional violation for refusal to reinstate Uhl to his former position. Counsel conceded, however, that a continuing constitutional violation has not been explicitly pleaded.

*to this court's reading, make the claim that the Guard has wrongfully refused to reinstate Uhl in the face of the DoD/IG's recommendation in violation of Uhl's constitutional rights.* Instead, the amended complaint only claims wrongful discharge and certain misconduct accompanying that discharge. That discharge, which gave rise to all of the claims at issue here, occurred on June 9, 1988.

In light of the claims actually pleaded, the court concludes that the critical issues for disposition of these motions for summary judgment are (1) the statute of limitations issue, and (2) the applicability of the *Feres* doctrine to this case. The court will therefore concentrate its attention on these two matters.[8]

### A. The Statute Of Limitations For § 1983 Claims

#### 1. The Applicable Statute

■ Section 1983 contains no statute of limitations, *Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985), and no federal statute of limitations governs such actions. *Board of Regents, Univ. of New York v. Tomanio,* 446 U.S. 478, 484, 100 S.Ct. 1790, 1795, 64 L.Ed.2d 440 (1980); *Carr v. Aubuchon,* 969 F.2d 714, 716 (8th Cir.1992). When such a void in federal statutory law occurs, federal courts have repeatedly "borrowed" the state laws governing an analogous cause of action. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *O'Sullivan v. Felix,* 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914). Thus, courts have applied the personal injury statute of limitations of the state in which the court sits to constitutional claims brought pursuant to § 1983. *Owens v. Okure,* 488 U.S. 235, 236, 109 S.Ct. 573, 574, 102 L.Ed.2d 594 (1989); *Wilson v.*

*Garcia,* 471 U.S. at 280, 105 S.Ct. at 1949; *Penn v. Iowa State Bd. of Regents,* 999 F.2d 305, 307 (8th Cir.1993) (applying Iowa's two-year personal injury statute, citing *Wilson*); *Davis v. Ross,* 995 F.2d 137, 138 (8th Cir. 1993) *(per curiam)* (applying Iowa's two-year personal injury statute of limitations, citing *Wycoff v. Menke,* 773 F.2d 983, 984 (8th Cir.1985), *cert. denied,* 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986)); *Kaster v. State of Iowa,* 975 F.2d 1381, 1382 (8th Cir. 1992) (Iowa's two-year personal injury statute of limitations applies to a § 1983 action); *Carr,* 969 F.2d at 716 (applying Missouri's five-year personal injury statute); *Lown v. Brimeyer,* 956 F.2d 780, 781 (8th Cir.) (Iowa's two-year personal injury statute applies to § 1983 claims, citing *Wycoff*), *cert. denied,* — U.S. —, 113 S.Ct. 176, 121 L.Ed.2d 122 (1992); *Bridgeman v. Nebraska State Penitentiary,* 849 F.2d 1076, 1077 (8th Cir.1988) (applying Nebraska's four-year personal injury statute to § 1983 claim, thus applying *Wilson* retroactively); *Chandler v. Presiding Judge, Callaway County,* 838 F.2d 977, 978–79 (8th Cir.1988) (applying Missouri's five-year personal injury statute of limitations); *Hughes v. Sheriff of Fall River County Jail,* 814 F.2d 532, 533 (8th Cir.) (applying South Dakota's three-year personal injury statute to § 1983 claim), *appeal dismissed and cert den.,* 484 U.S. 802, 108 S.Ct. 46, 98 L.Ed.2d 10 (1987); *Wycoff,* 773 F.2d at 984.

■ Thus, in this § 1983 action alleging violation of constitutional rights, this court must apply the personal injury statute of the state of Iowa. The applicable statute of limitations is Iowa Code § 614.1(2). That statute provides, in pertinent part:

---

8. The ground Uhl has asserted for partial summary judgment on Count I, that the military bodies to examine his discharge have already concluded that his constitutional rights were violated and that there is therefore no genuine issue of material fact on those questions, must be called into considerable doubt by a case Uhl has cited in support of another proposition. In *Jorden v. National Guard Bureau,* 877 F.2d 245 (3d Cir.1989), the Third Circuit Court of Appeals concluded that decisions of the AFBCMR had no

preclusive effect in a subsequent federal lawsuit, because "the Board's proceedings completely lacked the attributes necessary to accord preclusive effect to its decision." *Jorden,* 877 F.2d at 250. Rather, the court found that the AFBCMR's conduct was primarily investigative, not judicial. *Id.* However, the court concludes in the present case that because of its disposition of defendants' motion for summary judgment, it need not reach the question raised by Uhl's motion for partial summary judgment.

#### 614.1 Period.

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:

\* \* \* \* \* \*

2. *Injuries to person or reputation— relative rights—statute penalty.* Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years.

Iowa Code § 614.1(2). Thus, Uhl's claim will be time-barred under the applicable statute of limitations, unless the running of that statute was tolled, if his action was brought more than two-years after his cause of action accrued.

### 2. *Accrual Of A § 1983 Claim*

Although courts look to state law to determine the applicable limitations period, federal law governs when a cause of action under § 1983 accrues. *See, e.g., Board of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980); *Gatrell v. Gaylor,* 981 F.2d 254, 257 (5th Cir.1993); *Day v. Moscow,* 955 F.2d 807, 813 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992); *Lavellee v. Listi,* 611 F.2d 1129, 1130 (5th Cir.1980). Under federal law, the statute of limitations does not begin to run until the plaintiff knows or has reason to know of the injury which is the basis of the action. *Gatrell* 981 F.2d at 257 (citing *Lavellee,* 611 F.2d at 1130); *and compare Bressler v. Graco Children's Prod., Inc.,* 43 F.3d 379 (8th Cir.1994) (under Iowa law, a cause of action accrues when plaintiff knows or should reasonably have discovered the injury and its cause). Furthermore, the running of the statute is not tolled by pursuit of state court remedies on the ground that the federal claim did not accrue until conclusion of the state court actions; rather, the cause of action accrues when the constitutional wrong inflicted by state officials occurs. *Kaster,* 975 F.2d at 1382 (§ 1983 claim accrued at time of search and seizure, not at conclusion of state court proceedings); *see also Davis,* 995 F.2d at 138 (§ 1983 claim accrued at time of alleged assault during arrest, citing *Kaster* ). The

Eighth Circuit Court of Appeals looks to the face of the complaint to determine when the claims of deprivations of constitutional rights accrued in a § 1983 action. *Penn,* 999 F.2d at 307 (looking to face of complaint to determine when due process and equal protection claims accrued, and finding such claims time-barred). Similarly, claims arising from a discharge from employment accrue when the employee is notified of the employer's decision, not on the date the decision becomes effective. *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 381 (8th Cir.1994) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980)).

In the present case, the court noted above that the face of the amended complaint reveals that the only claims of constitutional violations involved Uhl's allegedly wrongful discharge and certain misconduct accompanying that discharge, not claims of refusal to reinstate him. That discharge, which gave rise to all of the claims at issue here, occurred on June 9, 1988, and he was notified of his discharge on that date. Uhl's constitutional claims pursuant to § 1983 accrued when he was subjected to the wrongful conduct of state officials as those acts are identified on the face of his complaint. Thus, Uhl's § 1983 action accrued on June 9, 1988. Uhl's complaint was not filed until January 22, 1991, more than two years after his cause of action accrued. His cause of action pursuant to § 1983 would therefore appear to be barred by the applicable two-year statute of limitations, unless the running of that statute of limitations was somehow tolled.

### 3. *Tolling Of The Statute Of Limitations*

Because the state's statute of limitations for personal injuries is applicable to § 1983 claims, the federal court must also borrow the state's tolling statute, and, furthermore, operation of the tolling statute is "governed by state law." *Wilson,* 471 U.S. at 269, 105 S.Ct. at 1943 (federal court borrows statute of limitations, tolling statute, and state law on its operation); *Chardon v. Fumero Soto,* 462 U.S. 650, 657, 103 S.Ct. 2611, 2616, 77 L.Ed.2d 74 (1983) (federal

court must borrow state's tolling statute when it borrows state's statute of limitations); *Tomanio*, 446 U.S. at 484, 100 S.Ct. at 1795 (timeliness of suit is determined by the "state statute of limitations and the coordinate tolling rules"); *Roberts v. Dillon*, 15 F.3d 113, 115 (8th Cir.1994) (identifying Arkansas tolling rules as applicable to § 1983 claims, but finding no evidence of "concealment" by defendants allowing plaintiff to invoke those rules); *Carr*, 969 F.2d at 716 (citing *Tomanio*, and identifying state tolling rules, but finding them inapplicable to stay the case before the court); *Bridgeman*, 849 F.2d at 1078 (court applies state's tolling statute and state law on its operation); *Chandler*, 838 F.2d at 979 (same); *but see Hughes*, 814 F.2d at 535–36 (finding South Dakota statute tolling civil rights claims while a person is imprisoned inconsistent with federal policy, and thus inapplicable); *and compare Chandler*, 838 F.2d at 979–80 (upholding tolling by Missouri's prisoner incapacity statute until filing of claim, but refusing to consider whether that statute might be declared inapplicable as contrary to federal policy for the first time on appeal). This is because Congress did not establish a body of tolling rules applicable to actions brought in federal court under § 1983 any more than it established the statute of limitations for claims pursuant to § 1983.

Iowa Code Ch. 614 identifies various conditions as tolling the running of its personal injury and other statutes of limitations. Those conditions include minority or mental illness, § 614.8, damages for sexual abuse, § 614.8A, death of the person having the cause of action, § 614.9, failure of a cause of action on the same issues for any reason not founded on negligence, § 614.10, stay by injunction, § 614.13, and other provision concerning real estate transfers that are no more applicable here than the others identified specifically. The court therefore turns to conditions the Iowa Supreme Court has identified as sufficient to toll the running of the personal injury statute.

In *Speer v. Blumer*, 483 N.W.2d 599 (Iowa 1992), the Iowa Supreme Court held that the running of the personal injury statute of limitations was tolled from the date the tortfeasor was ordered to make restitution as the result of his criminal conviction for the assault until the date that the restitution order ceased to be effective as the result of the tortfeasor's discharge from probation. *Id.* at 601. Analogous circumstances are not present here. In *Mathias v. Glandon*, 448 N.W.2d 443 (Iowa 1989), the Iowa Supreme Court noted that § 614.8 provides for tolling of the statute of limitations for minority and mental disability. *Id.* at 443–44 (but deciding a sanctions motion for allegedly raising those grounds knowing the contentions of minority and disability were not applicable to the real party in interest). Other decisions of Iowa courts also identify grounds for tolling the statute of limitations that are not applicable here. *See Harden v. State*, 434 N.W.2d 881, 884 (Iowa 1989) (finding that 614.8's minority and mental disability tolling provision is inapplicable to statutes of limitations in other chapters of the code, specifically the chapter providing for causes of action against the state), *cert. denied*, 493 U.S. 869, 110 S.Ct. 194, 107 L.Ed.2d 149 (1989); *Healy v. Carr*, 449 N.W.2d 883 (Iowa Ct.App.1989) (finding no statutory or case law authority for extending the statute of limitations owing to the death of the tortfeasor); *Becker v. Star Auto, Inc.*, 376 N.W.2d 645 (Iowa Ct.App.1985) (filing of petition does not toll statute of limitations if no prompt effort is made to serve the defendant).

The court finds that federal equitable tolling rules are not inconsistent with Iowa's rules. "Equitable tolling is appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1266 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991). Uhl's principal argument that the statute of limitations had not yet run on his § 1983 claims when he filed his federal court action is that the running of the statute of limitations was tolled by his pursuit of administrative remedies within the military, first, to challenge the decision of the IANG following the MEB, and then to meet the prerequisites for a claim under the FTCA. The court concludes that Uhl's pursuit of other remedies, in state court and through federal agencies, did not prevent him from

meeting the filing deadline for his § 1983 causes of action.

■■■ There is no exhaustion of state remedies requirement before a civil rights suit may be filed under 42 U.S.C. § 1983, *Patsy v. Bd. of Regents of State of Florida*, 457 U.S. 496, 512, 102 S.Ct. 2557, 2565, 73 L.Ed.2d 172 (1982), as there is with Title VII claims. Although it is well-established that plaintiffs need not comply with state exhaustion requirements before filing section 1983 claims in federal court, nothing prevents them from so doing. *Lawson v. Glover*, 957 F.2d 801, 806 (11th Cir.1987). Given that plaintiffs may, if they choose, seek to exhaust state administrative remedies, the Eleventh Circuit Court of Appeals has concluded that the rule that federal courts must employ the applicable state statute of limitations in § 1983 cases clearly requires federal courts to give a § 1983 plaintiff the benefit of any toll effected by his compliance with a state exhaustion requirement. *Id.* In the present case, however, there has been no attempt to exhaust state remedies,[9] and there was no state administrative remedy required or available; rather, Uhl asserts that his pursuit of federal administrative remedies under the FTCA tolled the running of the statute of limitations as to all of his claims.

Turning to the question of whether § 1983 requires exhaustion of federal administrative remedies before resorting to the federal courts, in *Crown Coat Front Co. v. United States*, 386 U.S. 503, 510–11, 87 S.Ct. 1177, 1181–82, 18 L.Ed.2d 256 (1967), the Supreme Court held that a claim pursuant to § 1983 based upon review of an administrative agency's decision does not accrue until the agency action is final; thus, the statute of limitations for claims covered by a mandatory federal administrative process does not begin to run until conclusion of that process. *Lown*, 956 F.2d at 782.

■■■ However, because of the clear congressional intent not to require exhaustion of administrative remedies before filing a claim pursuant to § 1983, there is no tolling of the statute of limitations when a plaintiff pursues a voluntary administrative process. *Black v. Broward Employment and Training Admin.*, 846 F.2d 1311, 1314 (11th Cir.1988). In *Chambers v. Omaha Public Sch. Dist.*, 536 F.2d 222 (8th Cir.1976), the Eighth Circuit Court of Appeals refused to toll the statute of limitations for § 1983 claims on the basis of the administrative exhaustion requirement for companion Title VII claims. The court wrote:

> Plaintiff's contention that the statute of limitations should have been tolled while he was seeking administrative relief from H.E.W. pursuant to 42 U.S.C. § 2000d is without merit. The general law on this issue has been expressed in *Camacho v. United States*, 494 F.2d 1363, 1369, 204 Ct.Cl. 248 (1974):
>
> > Where the filing of an administrative claim or other proceeding is not made a statutory prerequisite to suit but is only permissive, the statute of limitations is not tolled by the pendency of such a claim.
>
> *See Soriano v. United States*, 352 U.S. 270, 274–75, 77 S.Ct. 269, 272–273, 1 L.Ed.2d 306, 310–311 (1957).
>
> Plaintiff does not allege that H.E.W. review of his claims is a prerequisite to a § 1981 or § 1983 action. The remedies available under Title VII of the Civil Rights Act of 1964 on the one hand, and § 1981 and § 1983 on the other, are completely separate and independent. *Cf. Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295, 302 (1975). The Supreme Court, in *Railway Express Agency*, has held that the statute of limitations control-

---

9. Uhl did file related claims in state court, but he also filed the present claims in federal court, thus overlapping his pursuit of his state court action. Uhl plainly did not consider that his state court proceedings were intended to exhaust state remedies before pursuing federal ones, because he never exhausted appeals in state court before pursuing his federal action, and, the court concludes, the claims in the two cases were not identical. Even if the court were to determine that the claims in the state and federal courts were so closely related as to be an attempt to pursue parallel remedies, the court has noted above that there is no state exhaustion requirement for § 1983 claims, and therefore any attempt by Uhl to pursue his remedies first in state court would not have any effect on the running of the statute of limitations on his federal claim.

ling § 1981 actions is not tolled while a complainant is pursuing administrative remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Greene v. Carter Carburetor Co.,* 532 F.2d 125 (8th Cir.1976). We think the principles of *Railway Express Agency* apply equally in the present case and hold that an individual's permissive resort to any H.E.W. remedies pursuant to § 2000d will not toll the statute of limitations applicable to any § 1981 or § 1983 claim.

*Id.* at 230–31. The same reasoning should apply to the exhaustion requirement for claims under the FTCA as compared to § 1983 claims.

Uhl was required to pursue an administrative process in order to bring his claims covered by the Federal Tort Claims Act before the federal court. 28 U.S.C. § 2674. Also, there was an administrative process available for challenging the MEB decision, which Uhl pursued to the DoD/IG, and in another administrative process leading to the decision of the AFBCMR in Uhl's favor. The question then becomes whether either of these federal administrative processes tolled the statute of limitations in this case.

■ This court has already disagreed with the contention that Uhl did not have a constitutional claim until the IANG refused to reinstate him in the face of the DoD/IG's recommendation and the AFBCMR's removal of the medical disability to service from Uhl's records. No such claim of refusal to reinstate in violation of constitutional rights to due process and equal protection can actually be found on the face of the complaint. Each constitutional claim instead challenges the discharge in June of 1988. The statute of limitations bars the claims actually pleaded, because the present lawsuit was not filed until more than two years after those claims

accrued, and no administrative process through the DoD/IG or the AFBCMR tolled the running of the statute of limitations as to those claims, because no exhaustion of these administrative procedures was required in order to file these claims in a federal court. Furthermore, the DoD/IG and AFBCMR processes did not *prevent* Uhl from filing his claims in federal court. Those processes were neither prerequisites to a federal lawsuit, nor did they purport to be Uhl's exclusive remedies subject only to judicial review.

■ As to the argument that the running of the statute was tolled by Uhl's pursuit of his claims through the FTCA administrative process, only one of the § 1983 claims was presented in that process. The claim for violation of due process was never presented as an FTCA administrative claim, although the § 1983 claim for violation of equal protection was the wrongful discharge claim pursued in that process. Again, both claims accrued more than two years before the present suit was filed. The due process claim plainly was not tolled by any administrative action on companion claims. Furthermore, the equal protection claim was not tolled by presenting it in the FTCA administrative process, because the FTCA administrative process was a voluntary, rather than a required, process for such a constitutional claim. Thus, the statute of limitations has run as to either of the constitutional claims pursuant to 42 U.S.C. § 1983 in the Amended Complaint. The court concludes below, however, that even if the statute of limitations had not run as to Uhl's § 1983 claims, those claims are barred by the *Feres* doctrine.

■ Unlike the § 1983 claims, however, the FTCA administrative process was required for the intentional interference claim.[10] Therefore, the statute of limitations

---

10. The applicable provision of the Federal Tort Claims Act is as follows:

**Disposition by federal agency as prerequisite; evidence**

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope

of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provi-

did not run on that claim before it was filed. The question of whether the statute of limitations for Uhl's Privacy Act claim had run before his suit was filed is considered below.

## B. The Statute Of Limitations For Privacy Act Claims

■ The Privacy Act of 1974, 5 U.S.C. § 552a, provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains. . . ." 5 U.S.C. § 552a(b)(1); *Henson v. National Aeronautics and Space Administration*, 14 F.3d 1143, 1148 (6th Cir. 1994). The Act makes an exception for disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1); *Henson*, 14 F.3d at 1148. An individual may file a civil action against an agency that fails to comply with the provisions of the Privacy Act in such a way that adversely affects the individual. 5 U.S.C. § 552a(g)(1)(D); *Henson*, 14 F.3d at 1148. In order to receive damages, the plaintiff must prove that the government's actions were intentional or willful. 5 U.S.C. § 552a(g)(4); *Henson*, 14 F.3d at 1148; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987) (citing cases from the Fifth and Eighth Circuits). Thus, the Privacy Act creates a cause of action against a federal agency and not individual officials. *See Windsor v. The Tennessean*, 719 F.2d 155,

160 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). This court therefore assumes that Uhl's Privacy Act claim is directed only against the IANG and not against the individual superior officers identified in the complaint.[11]

■ Unlike 42 U.S.C. § 1983, which contains no statute of limitations, the Privacy Act does provide its own two-year statute of limitations in 5 U.S.C. § 552a(g)(5).[12] The Privacy Act also provides its own administrative remedies in 5 U.S.C. § 552a(d)(3). There is a split of authority on the question of whether or not exhaustion of administrative remedies is required under the Privacy Act. *See, e.g., Douglas v. Agricultural Stabilization and Conservation Serv.,* 33 F.3d 784, 784 (7th Cir.1994) (identifying *Diederich v. Department of the Army,* 878 F.2d 646 (2d Cir.1989), and *Harper v. Kobelinski,* 589 F.2d 721 (D.C.Cir.1978), as casting doubt on the district court's conclusion that there was an administrative exhaustion requirement under the Privacy Act, but not reaching that issue on appeal); *Quinn v. Stone,* 978 F.2d 126, 137 (3d Cir.1992) (there is an administrative exhaustion requirement for suits under § 552a(g)(2)(A), for correction of records, but not for suits under § 552a(g)(4), for damages). Indeed, this court finds no administrative exhaustion requirement in the provisions of the Privacy Act allowing for civil judicial actions for damages to remedy violations of the Act. 5 U.S.C. § 522a(g).

Because this court concludes that no administrative exhaustion requirement existed before Uhl could pursue his Privacy Act claim, for the same reasons that voluntary

---

sions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.
28 U.S.C. § 2675.

11. The court has doubts, apart from whether proper defendants have been identified, as to the merits of Uhl's Privacy Act claim in the circumstances he has pleaded. Specifically, some of the conduct of which Uhl complains appears to fall within the exception of disclosure to persons with a need for the record in the performance of their duties stated in 5 U.S.C. § 552a(b)(1), because Uhl has complained about disclosures to members of the MEB. However, the court need not reach the merits of Uhl's Privacy Act claim in

order to dispose of the present motions for summary judgment.

12. The pertinent provisions are as follows:
 An action to enforce any liability created under this section may be brought . . . within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. . . .
 5 U.S.C. § 552a(g)(5).

pursuit of administrative procedures under the FTCA did not toll the running of the statute of limitations for § 1983 claims, it should not toll the running of the statute of limitations for the Privacy Act claim.[13] Thus, because the Privacy Act claim arose when the incorrect information was entered into Uhl's records and incorrect use or disclosure of those records was made, and all of those events occurred in close proximity to Uhl's discharge, the two-year statute of limitations for Uhl's Privacy Act claim had run before he filed the present lawsuit.

However, even if Uhl's pursuit of administrative remedies was a prerequisite to his federal Privacy Act claim, and therefore the statute of limitations had not run before Uhl filed suit, Uhl's Privacy Act claim also runs afoul of the *Feres* doctrine. Indeed, the court concludes that even if some or all of the claims presented here survive statute of limitations challenges, all of the claims presented in Uhl's amended complaint are barred by the *Feres* doctrine.

### C. The Feres Doctrine

The waiver of sovereign immunity under the FTCA is subject to an exception known as the *Feres* doctrine. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Mossow by Mossow v. United States,* 987 F.2d 1365, 1368 (8th Cir.1992). In *Feres,* the Supreme Court reasoned Congress did not intend when enacting the FTCA to waive sovereign immunity for suits by members of the armed forces against the United States. *Mossow,* 987 F.2d at 1368. The *Feres* doctrine therefore holds generally that the United States is not liable under the FTCA for "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres,* 340 U.S. at 146, 71 S.Ct. at 159; *Mossow,* 987 F.2d at 1368. Under the *Feres* doctrine, "claims under the Federal Tort Claims Act," negligence claims, claims brought under 42 U.S.C. § 1983, and *Bivens* claims are nonjusticiable if they involve injuries which "arise out of or

are in the course of activity incident to service." *Wood v. United States,* 968 F.2d 738 (8th Cir.1992) (citing *Watson v. Arkansas Nat'l Guard,* 886 F.2d 1004, 1005-08 (8th Cir.1989), which discusses cases that apply the *Feres* doctrine). "'[C]ivilian courts may not sit in plenary review over intra-service military disputes.'" *Watson,* 886 F.2d at 1007 (quoting *Crawford v. Texas Army Nat'l Guard,* 794 F.2d 1034, 1035 (5th Cir.1986)). Thus, the permissible range of lawsuits by members of the military against their superior officers "'is at very least, narrowly circumscribed.'" *Id.* (quoting *Crawford,* 794 F.2d at 1035); *see also Wood,* 968 F.2d at 739 (citing *Watson* ).

### 1. Rationale For The Doctrine

The rationale for the *Feres* doctrine is, at least in part, that the military establishment is founded upon a unique "hierarchical structure of discipline and obedience to command." *Chappell,* 462 U.S. at 300, 103 S.Ct. at 2366. The Supreme Court in *Chappell* concluded that if service members were permitted to expose their superior officers to personal liability, "[t]he special nature of military life, the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel, would be undermined." *Chappell,* 462 U.S. at 304, 103 S.Ct. at 2367. The Court cautioned that it was not establishing a per se rule that military personnel could never seek redress in civilian courts for constitutional violations suffered in the course of military service:

This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service.

*Chappell,* 462 U.S. at 304, 103 S.Ct. at 2368 (citation omitted). Thus, the Court in *Chappell* said:

Civilian courts must [merely] hesitate long before entertaining a suit which asks the

---

**13.** Uhl's Privacy Act claim is not one to overturn the Air Force's resolution of his administrative claims; indeed, the AFBCMR corrected Uhl's military records as he requested. Rather, it is one for damages as the result of the IANG's alleged violations of the Privacy Act. As such, only the FTCA administrative procedures could be deemed to have tolled the running of the statute of limitations, if any event did.

court to tamper with the established relationship between enlisted military personnel and their superior officers [because] that relationship is at the heart of the necessarily unique structure of the military establishment.

*Chappell,* 462 U.S. at 300, 103 S.Ct. at 2366.

The Supreme Court has articulated several different formulations of the considerations which it deems controlling in the *Feres* doctrine analysis. *Stanley v. United States,* 786 F.2d 1490, 1494–95 (11th Cir.1986), *rev'd in part, vacated in part, and remanded,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987).[14] In *Feres* itself the Supreme Court identified four factors from which it concluded that Congress had not intended to subject the government to liability for the service member's injuries: (1) the lack of parallel private liability; (2) the fact that because state law governs an action under the FTCA, the service member's right to recover would depend upon the geographical location of the service members's duty station, a fortuitous circumstance over which the service member has no control; (3) the "distinctively federal character" of the relationship between the government and its military personnel; and (4) the absence of any provision under the FTCA for adjustment of a service member's recovery under the Act with any recovery which he might receive under military statutory compensation schemes. *Feres,* 340 U.S. at 141–46, 71 S.Ct. at 156–59.

In *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), the Supreme Court stated that the three factors supporting the *Feres* doctrine are: (1) the distinctly federal relationship between service members and the government which makes it senseless to allow state law to affect the government's liability to service members; (2) the existence of no-fault military compensation schemes for service members; and (3) the negative effect on military discipline which would result from second-guessing military orders. *Id.* at 672–73, 97 S.Ct. at 2058–59. The Court reaffirmed the importance of all

three of these factors in *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987).

Underlying the considerations in *Feres,* according to another Supreme Court decision, was the belief that the relationship between a soldier and his or her superior officer is so unique and the intramilitary system of justice and administrative regulatory and remedial procedures so extensive that civilian courts should "hesitate long" before intervening to remedy any wrong allegedly done a service member. *Chappell,* 462 U.S. at 300, 103 S.Ct. at 2365. As the Supreme Court explained in *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954):

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claim Act were alleged for negligent orders given or negligent acts committed in the course of military duty, led the Court [in *Feres* ] to read the Act as excluding claims of that character. [Citation omitted.]

*Id.* at 112, 75 S.Ct. at 143. Thus, the concern that civilian court inquiry might adversely affect the intramilitary disciplinary structure has emerged as the most compelling rationale for the *Feres* doctrine. *See Chappell,* 462 U.S. at 300, 304, 103 S.Ct. at 2365, 2367.

In *Chappell,* the Supreme Court had occasion to consider the "special factors" that bear upon the propriety of a *Bivens* action brought by military personnel against their superior officers. The Court concluded that those "special factors" also formed the basis of the Court's decision in *Feres. Chappell,* 462 U.S. at 298, 103 S.Ct. at 2364. Thus, the *Feres* doctrine also bars *Bivens* style claims by military personnel when *Bivens* special factors counsel similar hesitation for judicial intervention. *Id.* at 298–300, 304, 103 S.Ct. at 2364–2366, 2367. This issue was taken up again by the Supreme Court in *Stanley,* 483 U.S. at 680–84, 107 S.Ct. at 3061–64. The Court again, citing *Chappell,* identified the "special factors" that counsel against a *Bi-*

---

**14.** The Supreme Court, in its reversal and remand of this case, did much to clarify the appropriate test for the applicability of *Feres* as the

"incident to service" test. *United States v. Stanley,* 483 U.S. at 680–81, 107 S.Ct. at 3061–63.

*vens* cause of action by military personnel, identifying them as (1) the constitutional authorization for Congress rather than the judiciary to make rules governing the military, (2) the unique disciplinary structure of the military, (3) Congress' establishment of an internal system of military justice, and (4) disruption of the military chain-of-command. *Id.* The Court then considerably narrowed the import of the language in *Chappell* which could be read merely to require "hesitation" before a court disregards the *Feres* doctrine:

> [I]t is irrelevant to a "special factors" analysis whether the laws currently on the books afford Stanley, or any other particular serviceman, an "adequate" federal remedy for his injuries. The "special facto[r]" that "counsel[s] hesitation" is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate. Similarly irrelevant is the statement in *Chappell,* erroneously relied upon by Stanley and the lower courts, that we have "never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." 462 U.S., at 304 [103 S.Ct., at 2368]. As the citations immediately following that statement suggest, it referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages. See *Brown v. Glines,* 444 U.S. 348 [100 S.Ct. 594, 62 L.Ed.2d 540] (1980); *Parker v. Levy,* 417 U.S. 733 [94 S.Ct. 2547, 41 L.Ed.2d 439] (1974); *Frontiero v. Richardson,* 411 U.S. 677 [93 S.Ct. 1764, 36 L.Ed.2d 583] (1973). Such suits, like the case of *Wilkes v. Dinsman,* 7 How. 89, 12 L.Ed. 618 (1849), distinguished in *Chappell,* 462 U.S., at 305, n. 2, [103 S.Ct., at 2368, n. 2], sought traditional forms of relief, and "did not ask the Court to imply a new kind of cause of action." *Ibid.*

*Id.* 483 U.S. at 683, 107 S.Ct. at 3063. Thus, under *Stanley, Chappell* is not an invitation to federal courts to disregard the *Feres* doctrine if the court "hesitates" before doing so.

### 2. The Test For Applicability Of The Doctrine

*Stanley* also established the test for determining the applicability of *Feres* as the "incident to service" test. *Id.* at 682–83, 107 S.Ct. at 3063:

> A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters. Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.

*Id.* The Second Circuit Court of Appeals, addressing tort claims against the military as the result of an accident rather than personnel decisions by a service member's superior officers, nonetheless very recently applied the "incident to service" test of the applicability of the *Feres* doctrine to a particular claim, focusing on the language of *Feres* itself:

> We believe that [the proper concerns under *Feres* ] are, in fact, fully captured by the original language in *Feres* that barred suits by military claimants for all injuries "aris[ing] out of or in the course of activity incident to service." 340 U.S. at 146 [71 S.Ct. at 159].

*Taber v. Maine,* 45 F.3d 598 (2d Cir.1995);[15] *Dozler v. United States,* 869 F.2d 1165, 1165 (8th Cir.1989) (applying "aris[ing] out of or ... in the course of activity incident to service" test).

---

**15.** The *Taber* decision was focused on the test for a death or disability tort claim:

> Under *Brooks [v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949) ], *Feres, Stencel, [United States v.] Shearer* [473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) ], and *Johnson,* an appropriate test for applying the Feres doctrine must respect: (1) the Supreme Court's stated concern for keeping courts away from delicate questions involving military dis-

In the context of a case more nearly on point with the present one, the Eighth Circuit Court of Appeals in *Watson* discussed the merits of this "incident to service" test over other multi-factor inquiries:

> The Court in *Stanley* stated that the mere process of deciding which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters. Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decision-making), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less intensive inquiry into military matters.

*Watson*, 886 F.2d at 1010 n. 14.

However, the Eighth Circuit Court of Appeals some time ago also applied a two-step

test to determining whether the *Feres* doctrine should apply in a given case, but noting at the same time that the doctrine is given "broad construction" in this circuit:

> Suffice it to say that, despite criticism, the doctrine retains its vitality, *see Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and has been given a "broad construction" by this circuit. *Miller [v. United States]*, 643 F.2d [481] at 491 [ (8th Cir.1980) ]. In *Brown*, we refined the analytical framework to be used in determining whether or not *Feres* should bar a claim:
>
>> We believe that our analysis can be broken down into two parts: (1) whether there is a relevant relationship between the service member's activity and the military service, and (2) whether military discipline will be impeded if the challenged conduct is litigated in a civil action.... To determine whether a relevant relationship exists between the service member's activity and the military service, we focus our attention on three factors that our court has considered important: the duty status of the service

---

cipline; (2) *Feres's* clear intention to replace the contingencies of local tort law with a uniform federal scheme; and (3) *Feres's* original desire that this uniformity is to be achieved through exclusive recourse to the federal system of military death and disability benefits. We believe that these concerns are, in fact, fully captured by the original language in *Feres* that barred suits by military claimants for all injuries "aris[ing] out of or in the course of activity incident to service." 340 U.S. at 146 [71 S.Ct. at 159]. As we have noted, this language derives from a familiar phrase ("arising out of or in the course of employment"), which has a well defined meaning in the context of workers' compensation. This definition, moreover, is closely related to the scope of the government's vicarious liability—since workers' compensation and respondeat superior are both concerned with charging costs to the business enterprise that can be fairly said to engender them. *See Childers [v. Shasta Livestock Auction Yard, Inc.,]* 190 Cal.App.3d [792] at 801, 235 Cal.Rptr. [641] at 644 [ (1987) ]. Thus, the two issues in this case coalesce. Because respondeat superior requires the government to pay for third-party injuries that are foreseeable costs of the general military enterprise, and because the federal statutory compensation scheme, buttressed by

the *Feres* doctrine, requires the government to pay for all employment-related injuries that are sustained by servicemembers only through a system of workers' compensation payments, it is appropriate that courts interpret the test for both in similar ways. We conclude that the same parameters of employment-related conduct that determine the existence of governmental vicarious liability should also generally define the limits of the *Feres* doctrine. In deciding whether *Feres* applies to bar a particular claim, a court should consider whether, at the time of the accident, the military-plaintiff's activity would have imposed respondeat superior liability on the government had that activity injured a civilian. If the answer is "yes," then the *Feres* doctrine applies because the servicemember sustained his or her injuries "in the course of activity incident to service." Conversely, if the answer is "no," there should be no *Feres* bar (absent a truly unusual discipline problem)—since the accident occurred outside the scope of military employment and, thus, would not be covered by a normal workers' compensation scheme.
*Taber*, 45 F.3d at 618–619 (internal citations omitted). Eighth Circuit Court of Appeals decisions considering the applicability of *Feres* to personal injury cases come to similar conclusions. *See, e.g., Bowers v. United States*, 904 F.2d 450 (8th Cir.1990).

member, the location of the injury, and the nature of the activity.

*Brown [v. United States,* 739 F.2d [362] at 367 [ (8th Cir.1984) ]].

*Stubbs v. United States,* 744 F.2d 58, 60 (8th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985). Uhl has attempted to focus the inquiry in this case into such a two-step test.

### 3. Claims To Which Feres Applies

■ Under either test, however, the court concludes that Uhl's claim concerns action to which *Feres* is applicable. The decision to remove him was clearly incident to his service in the IANG. Applying the two-step approach, Uhl's activity both as a technician and as an officer in the National Guard, the only conduct in question, was related to his military service, the military activity had an obvious direct relationship to his military service, and also to the civilian activity because he could not maintain his civilian position without the military rank. As to the second step in this analysis, military discipline would indeed be impeded if this court second-guesses a military personnel decision.[16] The conclusion that Uhl's claims are of a kind to which *Feres* is applicable is confirmed by further examination of the types of claims and claimants to which the courts have applied *Feres.*

#### a. Claims By Service Personnel And Dependents

■ It is undisputed that under *Feres,* claims brought by service members for service connected injuries are barred. *Mossow,* 987 F.2d at 1368 (citing *Stanley,* 483 U.S. at 669, 107 S.Ct. at 3055; *Bowers v. United States,* 904 F.2d 450 (8th Cir.1990)). However, claims are not barred under *Feres* when brought by civilians or civilian dependents of service members who have sustained a direct injury from military personnel. *Id.* (citing *Piper v. United States,* 887 F.2d 861 (8th Cir.1989); *Burgess v. United States,* 744

F.2d 771 (11th Cir.1984); *Portis v. United States,* 483 F.2d 670 (4th Cir.1973)).

■ There is an exception to this later kind of claim by civilian dependents or civilians, however, called the "genesis test." *Id.* at 1368-69. The genesis test evolved from *Stencel Aero Eng'g Corp.,* 431 U.S. at 666, 97 S.Ct. at 2055, which found a third party's claim that was derivative of a service member's claim is also barred under *Feres. Id.* at 1369. This derivative claim is one which had its basis in the service member's claim, and would not exist but for the service member's claim. Circuit courts have further expanded *Stencel* to bar claims for derivative injuries to civilians when the injuries have their "genesis" in a service-related injury to a service member. *Id.; see also Mondelli v. United States,* 711 F.2d 567 (3d Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *Lombard v. United States,* 690 F.2d 215, 223 (D.C.Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1347 (1983). The Eighth Circuit Court of Appeals wrote that "the genesis test was developed to bar claims when the injury to the civilian is a result of an injury to the service member." *Id.; see, e.g., Dozler v. United States,* 869 F.2d 1165 (8th Cir.1989) (*Feres* barred claim father's claim against Government under Federal Tort Claims Act alleging United States Army failed to warn or protect his daughter from assailant who shot and killed her in her barracks).

#### b. Claims By National Guard Members

Whether or not the *Feres* doctrine applies to claims by members of the National Guard depends in part upon whether the National Guard enjoys the same status as the other armed forces of the United States. In *Perpich v. United States Department of Defense,* 880 F.2d 11 (8th Cir.1989), *aff'd,* 496 U.S. 334, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990), the court examined in some detail the dual nature of the National Guard as both a federal, first line defense force, and the latter day incarnation of the states' militia. *Id.* at 14-

---

**16.** Uhl asserts that the decision in question is not a military one, because the military decision has been made by the DoD/IG and the AFBCMR, and all that is left is for this court to enforce that military decision. Again, that is not the claim

pleaded in the Amended Complaint. Even if it were, the court finds that the decision in question would be the IANG's military personnel decision to ignore the recommendation of the DoD/IG and refuse to reinstate Uhl.

16; *Illinois Nat'l Guard v. Federal Labor Relations Authority,* 854 F.2d 1396, 1397–98 (D.C.Cir.1988) ("The National Guard is the modern Militia reserved to the states by Art. I § 8, cl. 15, 16 of the Constitution. *Maryland for Use of Levin v. United States,* 381 U.S. 41, 46, 85 S.Ct. 1293, 1296, 14 L.Ed.2d 205 (1965)."). The National Guard has been described as an organization with both state and federal characteristics. *Knutson v. Wisconsin Air Nat'l Guard,* 995 F.2d 765, 767–68 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993). The Seventh Circuit Court of Appeals described the "hybrid" nature of the National Guard:

> The Guard occupies a distinct role in the federal structure that does not fit neatly within the scope of either state or national concerns. In each state the National Guard is a state agency, under state authority and control. At the same time, federal law accounts, to a significant extent, for the composition and function of the Guard. Accordingly, the Guard may serve the state at times of civil strife within its borders while also being available for federal service during national emergencies.

*Id.* at 767; *see also Charles v. Rice,* 28 F.3d 1312, 1315 (1st Cir.1994) (quoting *Knutson* ); *United States Dep't of Defense v. Federal Labor Relations Authority,* 982 F.2d 577, 578 (D.C.Cir.1993) ("The National Guard has the dual mission of serving both the state in which the Guard unit is located and the federal government. The Guard stands ready to preserve peace and order at the command of state authorities; and to provide combat ready units and to control domestic violence at the President's direction," citing *Perpich,* 496 U.S. 334, 110 S.Ct. 2418 (1990)).

State command of the National Guard is reposed in the governor of each state, and his or her appointee, the Adjutant General. 32 U.S.C. § 314; *Charles,* 28 F.3d at 1315. The relationship between the state and federal authority over the National Guard is as follows:

> The Defense Department, the Secretaries of the Army and Air Force, and the National Guard Bureau prescribe regulations and issue orders to organize, discipline, and govern the Guard. 32 U.S.C. § 110. States that fail to comply with federal regulations risk forfeiture of federal funds allocated to organize, equip, and arm state Guards. *Id.* §§ 101, 107, 108, 501; *Knutson,* 995 F.2d at 767.

*Charles,* 28 F.3d at 1315–16.

The Eighth Circuit Court of Appeals has specifically addressed the question of whether the *Feres* doctrine is applicable to a civilian technician in the National Guard. *Wood,* 968 F.2d at 739.[17] In that case, Lt.Col. Wood argued that the military justiciability doctrine of *Feres,* as summarized by this court in *Watson,* did not apply to his case because he was a civilian technician for the National Guard and he contended the position for which he sought appointment was a civilian technician position. *Id.* The Eighth Circuit Court of Appeals rejected that argument:

> To be eligible for a National Guard technician position, however, one must be a National Guard military member. 32 U.S.C. s 709(b). An employee's technician status must be terminated if the employee ceases to be a member of the National Guard. 32 U.S.C. § 709(e)(1). The hybrid nature of the position renders it susceptible to the doctrine restricting review of military decision-making. *Sebra v. Neville,* 801 F.2d 1135, 1141 (9th Cir.1986); *see also Watson,* 886 F.2d at 1005 n. 1 (finding the claims brought by National Guard member/technician nonjusticiable); *Stauber v. Cline,* 837 F.2d 395, 400 (9th Cir.) (Guard technicians' work integral to routine military operations), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988). Lt.Col. Wood does not contest that a determination of his military qualifications is a necessary step in determining whether he should have been assigned as alleged. *See* Technician Personnel Reg. 300 (335), pt. III ("These technicians will be afforded priority placement . . . in positions for which they meet the full technician and military qualifications." (emphasis added)). We agree with the district court that .

17. *Wood,* which was decided in July of 1992, was handed down after the ruling on the motions to dismiss, but before the ruling on the motion to reconsider that ruling.

justiciability concerns are present in this case because the placement decision is dictated in part by an assessment of the "riffed" technician's military abilities.

*Id.*

In *Wood,* the court concluded that *Watson* does provide two exceptions to the general rule that claims involving the National Guard are nonjusticiable. *Id.; Watson,* 886 F.2d at 1010–11; *cf. Gilligan v. Morgan,* 413 U.S. 1, 11, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) ("we neither hold nor imply that the conduct of the National Guard is always beyond judicial review"):

> First, facial challenges to the constitutionality of a military regulation or statute are justiciable. *Watson,* 886 F.2d at 1010 (citations omitted). Because Lt. Col. Wood is attempting to enforce the regulations and statutes, the first exception is not applicable. The second exception involves claims seeking limited judicial review of final agency action. *Id.* at 1011. The final decision is subject to judicial review and may be set aside if it is arbitrary and capricious or not based upon substantial evidence. *Id.; Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983).

*Id.* The court in *Wood* concluded that the applicability of the second exception to this case presents a closer question, because Wood had argued that applicable rules and regulations required that he be offered the position of Air Commander, but the Adjutant General had refused to do so, and there was no right of appeal of that decision within the National Guard. *Id.* at 739–40. The court in *Wood* compared the situation of the plaintiff before it with the prior case involving national guardsmen in *Watson:*

> In *Watson,* a former member of the National Guard sought damages and equitable relief, including reinstatement and back pay, pursuant to 42 U.S.C. §§ 1981 and 1983 for his allegedly wrongful discharge based on race. *Watson,* 886 F.2d at 1004–05. We held that the nature of the lawsuit, judicial review of a discrete military personnel decision, rendered it nonjusticiable. *Id.* at 1010 (citing *Crawford* ). In *Crawford,* the plaintiffs alleged that

their constitutional rights were violated by their dismissal from active duty in retaliation for reporting criminal activity and that the National Guard did not follow proper procedures in dismissing them. *Crawford,* 794 F.2d at 1035. The court found the nature of the lawsuit rendered it nonjusticiable. *Id.* at 1035–37.

As pleaded, the complaint in this case alleges that the internal National Guard personnel decision was incorrect and unconstitutional. The nature of the pleaded claim, judicial review of a discrete intraservice personnel decision which decision involves, as it does, an assessment of an individual's military qualifications for command responsibilities as the Air Commander of a Tactical Fighter Group, is nonjusticiable under *Watson.* While a claim seeking review of the final agency action to determine whether the agency followed its own regulations may be justiciable under the second *Watson* exception, we do not find such a claim to have been pleaded in this complaint even when we give it the liberal reading to which it is entitled.

*Id.* The court must turn next to application of the *Feres* doctrine to the present case, and is guided in its application by the precedents discussed above.

### 4. Application Of Feres In This Case

 The situation here is strikingly similar to that in *Wood.* The nature of the pleaded claim, review of a discrete intraservice personnel decision which decision involves, as it does in this case, an assessment of an individual's military qualifications for world-wide service, is also non-justiciable under *Watson.* While a claim seeking review of the defendants' refusal to reinstate Uhl after the conclusion of agency action may be justiciable under the second *Watson* exception, no such claim has actually been pleaded. However, the court has considerable doubt that such a claim would be justiciable under the second *Watson* exception, because it is not the agency determination that Uhl would be challenging, but the actual personnel decision refusing to follow the agency's recommendation, which is a command decision that falls

squarely within the prohibition of the *Feres* doctrine.

If the claim presented here in fact addressed the IANG's refusal to reinstate Uhl, then the court would agree with Uhl's argument that judicial enforcement of the DoD/IG's or the AFBCMR's recommendation that Uhl be reinstated would be less intrusive upon military discipline than would be other forms of judicial intervention. In such a situation, the court would only be enforcing a recommendation of the DoD/IG or AFBCMR for a service member's reinstatement which would be binding upon other, purely federal, branches of the military: At oral arguments, Uhl's counsel argued, and the defendants' counsel did not disagree, that but for the IANG's dual status as a state entity and a federal military organization, the recommendation of the IG that Uhl should be reinstated would be "gospel." In any purely federal branch of the military, so Uhl argues, the IG's recommendation would have been a command, and would have been enforceable by regular military authority. The court finds that if Uhl had been an active duty member of one of the regular armed forces, the AFBCMR, if not the IG, could have ordered his reinstatement. *See, e.g., Muhammad v. Secretary of the Army,* 770 F.2d 1494, 1495–96 (9th Cir.1985) (citing 10 U.S.C. § 1552 as giving the AFBCMR such power over the regular armed forces). If the court's intervention were merely to enforce a decision of the AFBCMR upon the "hybrid" National Guard which would be enforceable without judicial intervention in other, purely federal, branches of the military, then the court would not be engaged in "second-guessing" military orders, *Stencel Aero Eng'g Corp.,* 431 U.S. at 672–73, 97 S.Ct. at 2058–59, or disrupting the military command hierarchy or the military's internal system of justice, *Stanley,* 483 U.S. at 680–84, 107 S.Ct. at 3061–64; *Chappell,* 462 U.S. at 298–300, 304, 103 S.Ct. at 2364–66, 2367, at least not to

nearly the same extent, as seriously to implicate the concerns underlying the *Feres* doctrine. Thus, had Uhl presented such a claim, he would have a colorable argument that it fell outside the prohibition of *Feres.*

However, the Eighth Circuit Court of Appeals has rejected under *Feres* the justiciability of suits for the injunctive relief of reinstatement in the National Guard. In *Watson,* the court resolved the issue as follows:

> Based upon a searching consideration of the policies underlying *Feres* and *Chappell,* we are unable to conclude that military discipline will be any less affected by a suit for injunctive relief than by a claim for damages. The judiciary does not acquire competence in this area merely because the remedy sought is an injunction rather than damages. The military concerns found compelling in *Feres* and *Chappell* are equally present here.... To disallow claims for damages while agreeing to review claims for injunctive relief arising from the same facts would be to exalt form over substance. It follows that Watson's claim for reinstatement as a member of the Guard must be considered nonjusticiable, and we so conclude.

*Watson,* 886 F.2d at 1009. The court found its decision to meet the "incident to service" test articulated in *Stanley,* 483 U.S. at 682–83, 107 S.Ct. at 3063–64. Thus, even had Uhl presented this court with a claim for reinstatement, and sought an injunction to compel that relief, the court would be required to find such a claim nonjusticiable under *Feres* and *Watson.*[18]

At oral arguments, counsel for Uhl argued that the present case was distinguishable from *Watson* on the ground that, unlike Watson, Uhl has already made the fullest exhaustion of the military's remedies he can make by pursuing his claims through the IG and

---

**18.** Uhl cites *Jorden v. National Guard Bureau,* 799 F.2d 99, 111 (3d Cir.1986), *cert. denied sub nom. Sajer v. Jorden,* 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987), as contrary authority to the effect that the court may use its powers to order an injunction for reinstatement of a National Guard member. However, this decision preceded both *Watson,* and failed to persuade the *Watson* court, *see Watson,* 886 F.2d at 1004, and *Stanley,* 483 U.S. at 682–83, 107 S.Ct. at 3063–64, which confirmed that the proper test for applicability of *Feres* is the "incident to service" test, the test upon which the *Watson* court relied in denying injunctive relief in these circumstances.

the AFBCMR processes. *Watson*, however, does not require a contrary conclusion in the present case on the basis that Uhl has exhausted these remedies. In *Watson*, the court said:

> Although we hold that Watson's claim for reinstatement to the Guard is nonjusticiable, he is not left without any recourse. As previously noted, Watson may seek review from the Army Board for the Correction of Military Records. Established by Congress, the Board has the authority to correct error or injustice in a military record and to award back pay and other lost benefits, but does not have the power to compel reinstatement in a state Guard. The Board's decisions are subject to judicial review and may be set aside if they are arbitrary and capricious or are not supported by substantial evidence. This remedy was found sufficient in *Chappell*, 462 U.S. at 302–03, 103 S.Ct. at 2367, as it is the remedy Congress has chosen to provide. *See Holdiness v. Stroud*, 808 F.2d 417, 426 (5th Cir.1987).

*Watson*, 886 F.2d at 1011. Uhl argues, unfortunately without authority, that the AFBCMR does *not* have all of the remedial powers identified in *Watson*.[19] However, this court reads *Watson* to hold that the remedies Congress has provided within the military, of which Uhl has already availed himself, are adequate, even though they do not provide for reinstatement.

As a final basis for distinguishing the decision in *Watson* from his case, Uhl argues

that the failure of the plaintiff in *Watson* to pursue fully his administrative remedies left the court with nothing it could enforce. Uhl argues that *Watson* specifically admits the power of the court to review those administrative decisions, and the court should do so here to enforce the decisions of the DoD/IG and the AFBCMR. Indeed, the court in *Watson* did state that, "The [AFBCMR's] decisions are subject to judicial review," *id.*, but that power of judicial review is unavailing to Uhl here, because the court continued by stating that the AFBCMR's decisions "may be set aside if they are arbitrary and capricious or are not supported by substantial evidence." *Id.* *Watson* is therefore not an authorization for this court to *enforce* a decision of the AFBCMR, but only an authorization to correct a decision of that board if the court finds it to be flawed in the manner stated. Uhl did not lose before the AFBCMR and does not want that body's decision set aside as arbitrary or capricious or unsupported by substantial evidence; to the contrary, Uhl wants this court to enforce the AFBCMR's decision, and that this court cannot do under *Watson.*

This court is particularly troubled by the fact that without judicial intervention in this case, Uhl would be without a remedy for the IANG's continued refusal to reinstate him, a matter not presently before the court, or to take any action to remedy the past wrongs of which he has actually complained and which were so clearly pointed out by the DoD/IG and the AFBCMR. Although the *Feres* doctrine may countenance some unfairness in

19. The court's research indicates that the AFBCMR's authority to grant relief is as broad or broader, not less broad, than the Eighth Circuit Court of Appeals characterized it to be in *Watson.* The AFCBMR has the authority, pursuant to 10 U.S.C. § 1552(c), to order payment of the following from current appropriations of the Department of Defense: "loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or ... the repayment of a fine or forfeiture." It may also reinstate an active duty member in one of the federal military branches. *Muhammad v. Secretary of the Army*, 770 F.2d 1494, 1495–96 (9th Cir.1985) (citing 10 U.S.C. § 1552). Although the AFBCMR does not have the power to order reinstatement of a National Guard member into the state National Guard from which the member was wrongfully discharged, "it would have the power to correct [the member's] federal records to show that [the member's] federal rec-

ognition has not been withdrawn, reinstate [the member] in a comparable active federal reserve status, restore [the member's] pay and order compensatory back pay." *Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir.1991); *Williams v. Wilson*, 762 F.2d 357, 360 n. 6 (4th Cir.1985) (Army ABCMR lacks the authority to order the National Guard to reinstate a member, but does have the power to correct records, reinstate the Guard member to active federal reserve status, restore pay, and order back pay, citing *Penagaricano v. Llenza*, 747 F.2d 55, 57 (1st Cir.1984)); *Navas v. Gonzalez Vales*, 752 F.2d 765, 770 (1st Cir.1985) (same). The court has no information in the record as to what relief besides correction of records, if any, Uhl sought or received from the AFBCMR, nor does it have any information as to why the AFBCMR did not invoke the full panoply of the remedial powers within its authority in Uhl's case.

order to achieve protection of military authority, the court finds the situation here particularly unjust.

However, the National Guard of any state falls outside the direct command of central federal military authority except in certain situations not applicable here. *See Charles,* 28 F.3d at 1315–16 (describing the relationship between state and federal authority over the National Guard); *Guerra v. Scruggs,* 942 F.2d 270, 277 (4th Cir.1991) (AFBCMR may not order reinstatement of a National Guard member); *Williams v. Wilson,* 762 F.2d 357, 360 n. 6 (4th Cir.1985) (same); *Navas v. Gonzalez Vales,* 752 F.2d 765, 770 (1st Cir. 1985) (same). To the court's mind, this is letting the National Guard have it both ways: It is a federal military force entitled to the bar of the *Feres* doctrine, but its unique constitution as a state body immune from some central federal military authority means that it can thumb its nose at the results of the military's own remedial system, when, not coincidentally, such military remedial procedures provided one of the justifications for the *Feres* doctrine. *See Chappell,* 462 U.S. at 300, 103 S.Ct. at 2365.

However, the court in *Wood* ordered dismissal of the claims under the *Feres* doctrine even though the plaintiff had been confronted with refusal by the highest officer in the chain of command to follow the recommendation resulting from the internal administrative process. *Id.* at 738–40. Thus, on the basis of *Wood,* this court must reluctantly conclude that Uhl's claims are barred by the *Feres* doctrine.

## V. CONCLUSION

The court concludes that Uhl's claims pursuant to § 1983 are barred by the applicable statute of limitations. Those claims, as stated on the face of the complaint, arose from Uhl's *discharge,* and so accrued at the time of his discharge on June 9, 1988. The running of the statute of limitations was not tolled by any intervening events. Specifically, there is no requirement that a plaintiff exhaust state remedies before pursuing a § 1983 claim in federal court. Even if there was such a requirement, Uhl either did not pursue state remedies, because his state law claims are not identical to his federal constitutional claims, or did not pursue them to their conclusion, because he did not appeal adverse decisions of the state district court. Furthermore, there was no mandatory federal agency or administrative review required for Uhl's § 1983 claims, and his pursuit of required administrative processes for companion tort claims and voluntary pursuit of such processes for one of his § 1983 claims did not toll the running of the statute of limitations as to the § 1983 claims. For similar reasons, the court concludes that Uhl's pursuit of administrative remedies for his Privacy Act claim, which also were not mandatory, did not toll the statute of limitations for that claim. The statute of limitations had therefore also run as to the Privacy Act claim before this lawsuit was filed. However, the mandatory agency or administrative process under the FTCA for Uhl's other tort claim, intentional interference with a contract, did toll the statute of limitations as to that claim.

Nonetheless, the court concludes with great reluctance that all of the claims brought by Uhl are indeed barred by the *Feres* doctrine. Under controlling precedent, that doctrine is applicable to a member of the National Guard who has also been discharged from his civilian technician position. Each of the claims in Uhl's Amended Complaint arose out of the military personnel decision to discharge Uhl. The decision involved matters incident to Uhl's military service. Therefore, each falls within the prohibition on suits against military superiors embodied in the *Feres* doctrine. Again, under controlling precedent, the nature of the pleaded claim, review of a discrete intraservice personnel decision involving an assessment of an individual's military qualifications for world-wide service, is non-justiciable under *Feres.* Consequently, although the court finds such a resolution repugnant, plaintiff's motion for partial summary judgment must be denied, and defendants' motion for summary judgment must be granted. This matter must therefore be dismissed in its entirety.

**IT IS SO ORDERED.**